No. 68,202

STATE OF KANSAS, *Appellee,* v. ROY McCLANAHAN, *Appellant.*
(865 P.2d 1021)

Opinion filed December 10, 1993.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Kevin C. Fletcher,* assistant county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

 ██

LOCKETT, J.: This is a direct appeal by defendant from his conviction of one count of premeditated first-degree murder, K.S.A. 1990 Supp. 21-3401. Defendant claims the trial court erred in (1) failing to instruct the jury on the lesser included offenses of second-degree murder and voluntary manslaughter; and (2) admitting evidence that defendant had previously abused his wife.

Roy McClanahan was charged with one count of first-degree murder, K.S.A. 1990 Supp. 21-3401, a class A felony, and one count of aggravated burglary, K.S.A. 21-3716, a class C felony, for the events culminating in the killing of Michael Martin.

Roy was married to Josephine McClanahan. They separated in early May 1991 due to Roy's physical abuse of Josephine. Josephine moved in with Ginger McClanahan, Roy's daughter-in-law. Josephine told Ginger that she could not take Roy's beating her any more. Josephine explained to Ginger that she did not want Roy to know where she was staying because he would come and hurt her. Josephine did tell Roy she was living on Main Street in Hutchinson but did not give him the address.

After the separation, Josephine began dating Michael Martin, a next-door neighbor and friend of Roy's. Martin stayed the night on May 25, 1991, with Josephine. Ginger, her roommate Vanessa Collins, and Jimmy Robert had been sitting outside on the back porch that evening until about 4:30 a.m. Collins saw a blue four-door car with only one occupant drive up and down the alley three to four times. She could not identify the driver. Collins took Robert home around 5:00 a.m., then returned to the residence, turned out the kitchen light, and went to bed.

About the same time, Ginger's baby, who was sleeping in the room with Josephine and Martin, woke Josephine up, and she then heard glass breaking. Josephine, who was nude, put on a housecoat as she was leaving the bedroom to check what had caused the noise. She then saw Roy with a shotgun coming into the front room of the residence. Roy told Josephine to get out of the way, pushed her aside, and entered the bedroom. Josephine called to Ginger for help. Roy was in the bedroom for about two minutes. Josephine heard Martin say, "Oh shit"; then the gun fired. Roy came out of the bedroom, hit Josephine in the face, and left the house.

Josephine looked in the bedroom and saw that Martin had been shot. Martin was in a different position than when Josephine had left the bedroom prior to the shooting. The covers had been pulled off him. The county coroner testified the shotgun blast entered Martin's right side and destroyed his heart, both lungs, and the dome of his liver. The coroner opined Martin had raised his right arm up in an anticipatory or defensive move immediately prior to the shooting. The coroner could not say what position Martin was in when he was shot. There was a large hole in the blanket that was found in the bed with Martin.

Josephine and Ginger went outside and met a police officer responding to the report of the shooting. Ginger had been awakened by people arguing downstairs. The arguing went on for one to two minutes. She did not know who was arguing or what was said. She heard a loud sound like a door being slammed. When Ginger got downstairs she saw Josephine. Josephine told her that Roy had been there. Ginger did not see Roy in the apartment.

Officer Sharp was the first officer on the scene. Josephine told him that Roy had been in the house and had beaten her. Sharp noticed Josephine's face was red and swollen. A second woman told Sharp that a body was inside the residence. Minutes after arriving at the scene, Sharp received a police radio transmission that Roy had surrendered at the police station and had admitted the shooting.

After leaving the residence, Roy apparently went directly to the police station. At the station, Roy told the desk clerk he had just killed a man. When Sergeant Angell, the detail commander, approached Roy, Roy assumed a "search position" by placing his hands on a railing. Roy told Angell he had found Martin in bed with Roy's wife and had killed him. Roy was nervous and acted out of breath. Angell did not smell any odor of alcohol on Roy's breath.

Angell searched Roy and found a spent shotgun shell in one pocket and an unused shell in another pocket. Roy told Angell that the shotgun was outside in his car. A search warrant was obtained, and a 12-gauge shotgun was found in a four-door blue Buick registered to Roy and Josephine McClanahan. A search of Roy's residence turned up a box of 12-gauge shotgun shells with four shells missing.

One to two months prior to the shooting, Roy had borrowed the shotgun from Jim Lowe, Josephine's brother, allegedly to scare off prowlers who had been hanging around Roy's residence. Lowe testified that Roy asked him how to load rock salt into the shotgun shells and then asked to borrow some shells. Lowe told Roy to get his own shells. Lowe only showed Roy how to load one shell at a time into the shotgun.

Jim Lowe and his wife Teresa both testified that on separate occasions, prior to the shooting, after Jim had loaned the shotgun to Roy, Roy had stated he would kill Josephine and her lover if he caught her messing around or stepping out on him. Roy told Teresa he would plead insanity to get away with it. Jim did not do anything because he did not think Roy was capable of carrying out the threat.

Roy McClanahan testified on his own behalf. Roy believed that Josephine was seeing someone else. He broke into the residence where Josephine was staying to find out what was going on. Roy claimed that during the week prior to the shooting, he had been threatened by two men he recognized but whose names he did not know. The men informed Roy if he bothered Mike and Josephine they would "kick his ass."

Roy testified that he had not intended to shoot anyone when he entered the residence. He took the shotgun to prevent anyone from bullying him. Roy said when he saw Josephine coming out of a bedroom, without any clothes on, putting on a robe, he was stunned, got angry, and "flipped." Roy stated he noticed a bruise on Josephine's cheek and asked her where it came from. She told him she "stepped through the bedroom door." Roy pushed Josephine aside and entered the dark bedroom. Someone grabbed the barrel of the shotgun and pulled Roy forward. Roy jerked back, and the gun went off. Roy testified he did not pull the bedding off of Martin. Roy stated he had not fought with Martin. Roy denied that he had cruised the alley before entering the residence, that he had struck Josephine after the shooting, or that he had an extra shell in his pocket when arrested at the police station.

On cross-examination, Roy stated he did not know if Martin was under the blanket when the gun fired. Roy claimed he learned that it was Martin who was in the bedroom as he was

leaving the residence when Josephine said that he had shot Martin. Roy admitted Angell had found the second shell when Angell searched Roy at the police station. Roy denied that Martin said anything before the shot was fired. Roy also denied that he had asked Jim Lowe how to load rock salt in a shotgun shell, that Lowe had refused to give him any shells, or that Lowe had only shown him how to load one shell at a time. Finally, Roy denied telling the Lowes that he would kill Josephine and her boyfriend if he caught her "messing around."

Towards the end of cross-examination the prosecutor asked, "Isn't it true that when you flipped that you just got that much more angry and you went in that bedroom and finished the job and killed Michael Martin?" Roy replied, "The way I understand now, yes. The way I understand now, yes. At the time, no." The prosecutor then asked Roy if he disagreed that he beat Josephine up after he shot Martin and he said no. In response to the prosecutor's assertion that Roy was the only one claiming the shooting was an accident, Roy replied:

"I ain't saying it's an accident or what. I don't know what happened really after the time of the crime I, I, you're right, I don't know what the right word. I tried to think it out, re-rationalize it. I have had dreams of it, flashbacks and stuff like that, and to your question, I don't know how to answer that."

At the close of the State's evidence, the defense requested lesser included instructions on second-degree murder and voluntary manslaughter be given. The State objected. The trial court noted the statement in *State v. Mayberry*, 248 Kan. 369, 385, 807 P.2d 86 (1991), that "before instructions on lesser included offenses are required there must be positive testimony presented by the defense to prove a version of the homicide contrary to the version presented by the State."

The trial court then ruled that because Roy had testified the shooting was unintentional, and both of the lesser crimes require an intentional homicide, the court was precluded from instructing on second-degree murder or voluntary manslaughter. Over the State's objection, the court did instruct the jury on the lesser included offense of involuntary manslaughter.

During deliberations the jury asked how long a time frame can be considered for premeditation. The court answered that there

was no particular time interval required between the thought and the act. The jury subsequently found Roy guilty of first-degree murder. He was sentenced to life with parole eligibility after 15 years. His motion for a new trial was denied. Roy now appeals his conviction.

## FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSES

The trial court has an affirmative duty to instruct the jury on all lesser included offenses for which there is evidence to support a conviction on the included offense. The evidence may be inconclusive, weak, or unsatisfactory, but must be substantial enough that a rational factfinder could reasonably find the defendant guilty of the lesser included offense. On review, this court views the evidence in the light most favorable to the defendant. *State v. Coleman*, 253 Kan. 335, 352, 856 P.2d 121 (1993).

Both second-degree murder and voluntary manslaughter are lesser degrees and therefore included offenses of first-degree murder. *State v. (Elbert) Dixon*, 252 Kan. 39, 42, 843 P.2d 182 (1992); K.S.A. 21-3107(2)(a). Was there substantial evidence to support a conviction on either of these lesser included offenses and require the trial judge to give an instruction on either or both offenses? Substantial evidence is that which " 'possesses both relevance and substance' " and which would be sufficient for a reasonable person to draw a conclusion from. *State v. Grissom*, 251 Kan. 851, 907, 840 P.2d 1142 (1992).

We note the trial court erroneously concluded that before an instruction on a lesser included offense was necessary, *State v. Mayberry*, 248 Kan. at 385, required McClanahan to present positive evidence that the killing of Martin was not intentional. That statement in *Mayberry* is taken from *State v. Garcia*, 233 Kan. 589, 608-09, 664 P.2d 1343 (1983). *Garcia* quoted *State v. Hutton*, 232 Kan. 545, 554, 657 P.2d 567 (1983), which modified a statement from *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979), that read:

"In order for the evidence to be sufficient to require instructions on lesser degrees of the homicide, the testimony supporting such instructions must be offered either by the State or by the defense for the purpose of proving

what events occurred at the time the homicide was committed. Contradictory statements of a witness which are offered only for the purpose of destroying his credibility and not as positive evidence to prove the matters contained in the statements are not alone sufficient to require an instruction on the lesser degrees of homicide." 226 Kan. at 714.

The confusion arose because the trial court and the parties failed to note that in *Mayberry* and *Garcia* neither the State nor the defendants had presented evidence that required an instruction on a lesser included offense. In each of those cases, the State's evidence indicated that the defendant was guilty of the crime charged. Each of the defendants claimed that he was not guilty of the crime charged. The *Mayberry* and *Garcia* courts recognized that if the State's evidence was that the offense charged was committed, to require an instruction on a lesser included offense, the defendant had to present substantial evidence of a lesser included offense.

Our statements of law in both *Mayberry* and *Garcia* were based on the unusual facts of those cases, and they do not constitute a broad principle of law. Our statement in *Marks* is a statement of the complete rule.

The conflict was resolved recently in *Coleman* when we noted that the evidence to support an instruction on lesser included offenses does not have to be presented by the defense but may be adduced by either side. *Coleman*, 253 Kan. 335, Syl. ¶ 6. In *Coleman*, there was testimony of several versions of the shooting. There was evidence that Coleman did not fire the gun, that it was accidental, or that it was intentional, done with malice or in the heat of an argument. Under those varying theories, all supported by substantial testimony, regardless of the relative strength or weakness of the credibility of the individual witnesses, an instruction on both voluntary and involuntary manslaughter as lesser included offenses of second-degree murder was required.

## SECOND-DEGREE MURDER

Second-degree murder is "the malicious killing of a human being, committed without deliberation or premeditation and not in the perpetration or attempt to perpetrate a felony." K.S.A. 21-3402. The only difference between first- and second-degree murder is that the former requires the element of premeditation.

In arguing that an instruction on the lesser offense of second-degree murder was not required, the State points to *State v. (Cain) Dixon*, 248 Kan. 776, 787, 811 P.2d 1153 (1991). Dixon had threatened to kill his estranged wife. He had confronted his wife in a violent manner and had obtained a shotgun the day of the killing. He had also spent several hours thinking about shooting his wife prior to forcing his way into the apartment and shooting her three times. Defendant then calmly left, found his wife's boyfriend, and shot him. We noted that the evidence indicated that Dixon had either acted in self-defense or that the shooting of his wife and her boyfriend was premeditated. Because all the other evidence showed the killing to be intentional, we determined that Cain Dixon's statement that he wanted to confront the boyfriend and did not intend to kill him, by itself, was insufficient to require an instruction on any lesser degrees of homicide.

In comparing this case and the *(Cain) Dixon* case, the question is whether there is more evidence to support a second-degree murder instruction than there was in the *Dixon* case to support giving an involuntary manslaughter instruction.

Two cases with factual similarities, and some dissimilarities, indicate that the trial court erred in failing to instruct on second-degree murder as a lesser included offense. The first is *State v. Broadus*, 206 Kan. 766, 481 P.2d 1006 (1971). Broadus and his wife were in the process of divorcing. Broadus was under a court order to stay away from his wife's residence. Broadus, carrying a revolver, broke into the house at about 5:30 a.m. and found his wife in bed with her "known boyfriend." Broadus shot the boyfriend, who later died, and wounded his wife. Broadus left the house, reentered it, called the police, and reported the shooting.

Broadus was charged with first-degree murder, and the jury was instructed on the lesser included offenses of second-degree murder and manslaughter in the third degree, K.S.A. 21-413 (Corrick) (now K.S.A. 21-3403, voluntary manslaughter), as well as justifiable homicide, K.S.A. 21-404 (Corrick). The *Broadus* court determined that under the facts the trial court had correctly instructed the jury on the lesser included crimes. Broadus, however, unlike Roy, readily admitted to intentionally shooting his

wife and her boyfriend and told the police he would do it again under the same circumstances.

The other case is *State v. (Elbert) Dixon*, 252 Kan. 39. Dixon had been living with Marva Bell, but they separated. He went to her residence because he suspected she had someone else at her residence with her. She would not let him in, so he pointed the gun at her and shot her in the chin. Dixon turned himself in and admitted he shot Bell, but told the police that he did not really want to shoot her. Dixon was charged with and convicted of attempted first-degree murder.

Dixon did not testify at trial, but his prior statements to the police were admitted into evidence. Dixon told the officers that he had consumed crack cocaine less than an hour before the shooting, his thought processes may have been disorganized, he believed someone else was at the residence with Bell, and his professed intent was only to scare Bell. He told the police he was scared and that he did not want to shoot her, but he admitted pointing the gun at her and firing it. *Dixon*, 252 Kan. at 44-45. The *Dixon* court held it was error to not instruct the jury on the crime of attempted second-degree murder. In *Dixon*, as here, there was substantial evidence of premeditation and evidence to support a conviction on the lesser offense.

Even though Broadus and Elbert Dixon had admitted pointing a gun and firing it, in light of the defendants' statements that their shooting may have been on impulse and not premeditated, we determined in each case that the trial court had a statutory duty to instruct on second-degree murder.

Here there are two different versions of what occurred. The State's evidence was of the prior threats Roy related to Jim and Teresa that he would kill his wife and her lover if he caught them fooling around, of Roy's cruising the alley in his blue car until the porch light was turned off, and of Roy's statement to Josephine that he had already committed one murder that night.

Roy points to his equivocal and contradictory statements that the shooting was not premeditated but an accident and that he did not really remember what happened that night; he also points to the circumstances of his finding another man with his nude wife. Roy denied threatening to kill Josephine and her boyfriend if he caught her "messing around." He also denied cruising the

alley. There was no positive identification by Vanessa that his car was the car in the alley. Roy's evidence indicates that the killing of Martin was unintentional, not premeditated, and in the heat of passion. Does the evidence reasonably support a conclusion that Roy shot Martin intentionally and maliciously, but not with premeditation?

In this case, the jury was faced with the alternatives of first-degree murder, a class A felony, and involuntary manslaughter, a class D felony. It did ask for a supplemental instruction on premeditation. If the jury believed the State's evidence that the shooting was intentional and malicious, but also believed there was no premeditation, it could have found Roy guilty of second-degree murder had it been instructed on that offense. Under these circumstances, it was error not to instruct the jury on the lesser included offense of second-degree murder.

## VOLUNTARY MANSLAUGHTER

Voluntary manslaughter "is the unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion." K.S.A. 21-3403. The key elements for this offense are whether the killing was intentional and whether there was legally sufficient provocation. See *State v. Hamons*, 248 Kan. 51, 63, 805 P.2d 6 (1991). The trial court, again relying on *Mayberry*, refused to give the instruction on voluntary manslaughter because Roy had failed to present evidence that the killing was intentional.

With regard to the lesser included offense of voluntary manslaughter, Roy asserts that an instruction was required because the jury could have concluded he killed Martin in the heat of passion. Roy asserts the fact he saw his estranged wife coming out of a bedroom naked and found Martin in the same bedroom is, "by any objective standard," sufficient provocation. Roy notes the widely accepted rule that a person who kills either his spouse or the spouse's paramour after finding them *in flagrante delicto* may be sufficiently provoked to commit voluntary manslaughter. The Georgia Supreme Court has held, under a similar set of facts, that the traditional heat of passion analysis should be applied to determine if the facts rise to the level of sufficient provocation. *Burger v. State*, 238 Ga. 171, 231 S.E. 2d 769 (1977).

We choose not to follow the rule espoused by Roy. Instead, we agree with the holding in *Burger* that each case should be analyzed under the traditional heat of passion analysis applied in voluntary manslaughter cases. The Kansas rules for determining whether heat of passion and sufficient provocation existed to support a voluntary manslaughter conviction, set out in *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 (1985), are:

"(1) Voluntary manslaughter is the intentional killing in the heat of passion as a result of severe provocation. . . .

"(2) 'Heat of passion' means any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror. Such emotional state of mind must be of such a degree as would cause an ordinary man to act on impulse without reflection. [Citations omitted.]

"(3) In order to reduce a homicide from murder to voluntary manslaughter, there must be provocation, and such provocation must be recognized by the law as adequate. A provocation is adequate if it is calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason. [Citation omitted.] In order for a defendant to be entitled to a reduced charge because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation. [Citations omitted.]

"(4) The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason. [Citations omitted.] In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant. The fact that his intelligence is not high and his passion is easily aroused will not be considered in this connection. [Citation omitted.]

"(5) Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered. [Citations omitted.]"

Whether the provocation is sufficient is an objective determination and must be more than mere words or gestures, and if assault or battery is involved, the defendant must have a reasonable belief that he or she is in danger of suffering great bodily harm or at risk of death. *Guebara*, 236 Kan. at 796-97.

Is there evidence of adequate provocation? The State points out that Roy had no right to be in the residence. Roy and Josephine had separated. If there was provocation, Roy created it

by breaking into and entering another person's residence while armed with a shotgun.

Although he recognizes the facts for the sample instructions are only "somewhat analogous," Roy cites PIK Crim. 2d 69.01 for support for giving the voluntary manslaughter instruction. In the 3d edition of PIK Crim., the following hypothetical facts are set out: The defendant's wife was having an affair with the victim. The defendant and the victim had previously fought, and there was "bad blood" between the two. Both were at a tavern drinking when the defendant shot the victim. Some witnesses claimed it was a deliberate shooting. Other witnesses testified there had been a heated argument prior to the shooting. The defendant testified the shooting was accidental and that he only brought the gun to frighten the victim. Under those facts, PIK recommends that the jury be instructed on voluntary manslaughter. Unlike those facts, in this case there is no evidence of prior bad blood between Roy and Martin or evidence of any argument. The hypothetical example in PIK is not sufficiently analogous to have required the instruction on voluntary manslaughter in this case.

Is there substantial evidence to support the conclusion there was sufficient provocation? Roy testified that he "flipped" when he saw his nude wife come out of the bedroom and put on a robe. He denied knowing who was in the bedroom, that he struggled with Martin, or that he and Martin argued. Ginger heard arguing but could not identify who the voices were. The testimony from Josephine and Roy indicates the arguing was between her and him, and nothing suggests that argument rose to a level to be legally sufficient provocation for Roy to kill Martin. Under these facts, there was no duty for the trial court to instruct the jury on voluntary manslaughter.

We note Roy also contends that "[w]hen a question exists as to whether the state has established each essential element of the greater offense, an instruction on applicable lesser included offenses is required." We disagree. A question of the sufficiency of evidence on the greater offense does not affect the inquiry into the need to instruct on the lesser included offense. The inquiry is only whether substantial evidence exists to support a conviction on the lesser offense. If a question does exist on an

element of the greater offense, the jury is to resolve that question. Such a question, by itself, does not trigger the duty to instruct the jury on any lesser included offense.

## ADMITTING EVIDENCE OF PRIOR ABUSE

The State first mentioned the prior physical abuse in its opening argument when it explained to the jury what evidence the prosecution would be introducing. Josephine, in her testimony, twice stated Roy had physically abused her before she moved out of their residence. When Ginger testified, she mentioned the prior physical abuse. Finally, on cross-examination of Roy, the existence of his prior physical abuse of Josephine was elicited without objection.

Roy asserts that because he was charged with the death of his wife's boyfriend, it was error to allow into evidence any reference to his prior acts of physical abuse of Josephine. The State points out that Roy failed to object to the evidence when it was introduced, that it was part of the res gestae, and that it was not an abuse of the court's discretion to admit it. Because the matter will be retried, we will disregard the fact that Roy failed to contemporaneously object and answer the question of whether it is error to admit this evidence as part of the res gestae or if not, then whether it is an abuse of discretion to admit the evidence.

Was it error to admit the evidence as part of the res gestae? Res gestae evidence is that evidence which does not constitute a portion of the crimes charged but has a natural, necessary, or logical connection to the crime. A good example is contained in *State v. Redford*, 242 Kan. 658, 666, 750 P.2d 1013 (1988), where evidence of the defendant's drug dealing and his belief that the victim had stolen from him was admitted as part of the res gestae because it was logically connected to the crimes of aggravated kidnapping and sexual assault of the victim. Another example of res gestae evidence is found in *State v. Kee*, 238 Kan. 342, 347, 711 P.2d 746 (1985), where the defendant, some 30 to 60 days prior to the theft of a 100-barrel oil tank, had removed the oil from the tank. Although Kee had not been charged with the theft of the oil, the removal of the oil facilitated the subsequent theft of the tank and was part of the res gestae.

Roy's prior physical abuse of Josephine was not connected to the killing of Martin, either temporally or logically. The McClanahans had separated several weeks prior to the shooting, and the evidence indicates the abuse occurred before the separation. The killing was connected to Josephine's relationship with Martin, not to McClanahan's abuse of his wife. There is no indication Josephine entered into the relationship with Martin for protection from Roy. The trial court's determination that the prior physical abuse was part of the res gestae was error.

The trial court also admitted the evidence of prior abuse because defense counsel brought up the subject of Josephine's adultery in voir dire. The State argues that "[i]t was only appropriate for the state to be allowed to tell the jury the real reason why she left the defendant," *i.e.*, because of the abuse. We disagree. The acts of abuse were not connected to the subsequent act of adultery. The reason Josephine left Roy was not relevant to the shooting.

The final ground for admitting the evidence urged by the State is that in marital homicides or assaults, evidence of a "discordant marital relationship" is admissible independent of K.S.A. 60-455 and requires no limiting instruction. *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991). Roy contends that since he killed Martin and not his wife, this is not a marital homicide case and this ground for admitting the evidence does not apply.

Ordinarily a family bond is present to admit evidence of a discordant relationship. See *State v. Taylor*, 234 Kan. 401, 673 P.2d 1140 (1983) (wife); *State v. Knapp*, 234 Kan. 170, 671 P.2d 520 (1983) (ex-wife); *State v. Crossman*, 229 Kan. 384, 624 P.2d 461 (1981) (stepdaughter). Recently this court extended this rule to persons living together outside of wedlock. *State v. Young*, 253 Kan. 28, 37, 852 P.2d 510 (1993). The condition present in all these cases is the relationship between the defendant and the victim. The evidence is therefore admissible " 'to establish the relationship of the parties, [to show] the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the witnesses.' " *Hedger*, 248 Kan. at 820. This evidence also bears on issues of motive and intent. *Mayberry*, 248 Kan. at 384.

There may be cases involving a third-party victim where evidence of a discordant relationship would be relevant and therefore admissible. However, in this case, other than the fact Josephine was not living with her husband, there was no connection between the prior physical abuse and the relationship between Roy and Martin. Roy's prior acts of physical abuse of Josephine are not relevant to his motive or intent in shooting Martin. Under the facts, that evidence is not admissible simply because the victim was Martin and not Josephine.

Because the evidence of prior abuse was inadmissible under any theory, the question of whether admitting it was an abuse of discretion is moot.

Reversed and remanded for a new trial.