Nos. 95,400
95,401

STATE OF KANSAS, *Appellee*, v. MARTIN VASQUEZ, *Appellant*.
(194 P.3d 563)

Opinion filed October 17, 2008.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant, and *Martin Vasquez*, appellant, was on a supplemental pro se brief.

*Jared S. Maag*, deputy solicitor general, argued the cause, and *Paul J. Morrison*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: In these consolidated criminal cases, defendant Martin Vasquez was convicted of three counts of first-degree murder; one count each of aggravated robbery, aggravated burglary, and felony theft; and two counts of misdemeanor theft. He was sentenced to three consecutive hard 40 terms on the three convictions of first-degree murder. In this appeal, his counsel raises six issues for our review; Vasquez raises several additional issues in a pro se brief.

On December 12, 1998, the bodies of Vasquez' wife, Robin; Robin's father, Howard Franks; and Tom Dinkel were discovered in Robin's home in Kinsley, Kansas. Each victim had been incapacitated by blows or gunshots, then executed by means of a final gunshot. Investigators recovered 9 mm bullet casings at the scene, and 9 mm bullets were recovered from the bodies. "Robin I Love You" was written on a wall at the scene. Although Dinkel's truck had been parked in the driveway in front of Robin's house the night before, it was no longer there the morning the bodies were found.

Mike Sebes, who had employed Vasquez, discovered that his 9 mm Firestar handgun was gone when he looked for it on December 14.

Dinkel's truck was found in Juarez, Mexico, in late December 1998. Dinkel's wallet was discovered along Highway 183 south of Kinsley in February 1999. Sebes' 9 mm Firestar was found in El Paso, Texas, in late December 2002.

In Case No. 99 CR 26—filed April 7, 1999; amended July 18, 2001; then amended again January 19, 2005—Vasquez was charged with three counts of first-degree murder in violation of K.S.A. 21-3401; one count of aggravated robbery in violation of K.S.A. 21-3427 for taking Dinkel's keys and wallet; one count of aggravated burglary in violation of K.S.A. 21-3716 for entering into or remaining within Robin's house with the intent to commit first-degree murder; one count of felony theft in violation of K.S.A. 21-3701 for taking Dinkel's truck; and one count of misdemeanor theft in violation of K.S.A. 21-3701 for taking Sebes' gun.

A related complaint in Case No. 98 CR 102 had been filed December 18, 1998, charging Vasquez with felony burglary in violation of K.S.A. 21-3715 and misdemeanor theft in violation of K.S.A. 21-3701 for taking a .357 pistol from Ron Sebes' truck. Ron Sebes is Mike Sebes' father. Vasquez had also worked with Ron.

Vasquez was arrested in Mexico on September 3, 2003; gave statements to police; and made his first appearance before the district court on October 19, 2004.

A preliminary hearing was held in the consolidated cases on December 16, 2004. The district magistrate who presided over the hearing dismissed the felony burglary count in Case No. 98 CR

102, but he bound Vasquez over on the misdemeanor theft count in that case and on the seven counts charged in Case No. 99 CR 26.

Vasquez requested separate jury trials in the two cases, and he waived his speedy trial rights at a February 18, 2005, motion hearing. Two months later, Vasquez obtained a change of venue from Edwards County to Pawnee County.

A few days after the venue transfer, the district judge sustained the State's motion to consolidate the two cases for trial. He also addressed two defense motions in limine. On the first, the judge excluded evidence of an emergency restraining order and a related Kinsley municipal court domestic battery case filed after a July 1998 incident in which Vasquez had pushed and bitten Robin. The judge ruled that he would, however, allow evidence of Robin's statements to law enforcement about the July 1998 incident. On the second motion in limine, the judge ruled on the admissibility of certain statements by Robin to coworkers. The judge ruled that evidence of the statements would be admitted: "[B]y a preponderance of the evidence . . . the defendant did procure the absence of the declarent [sic] in this case and therefore cannot benefit from said act."

At trial, the State's evidence covered the following additional information:

Vasquez and Robin were married in 1996, and their union swiftly deteriorated. Vasquez drank to excess; by mid-1998, Robin was seeking a divorce.

Vasquez worked for Mike and Ron Sebes in their Kinsley farming operation during the summer of 1998. In mid-October, Vasquez left Kansas for several months to harvest crops on his own land in Mexico. While in Mexico, Vasquez contacted Robin, who told him she did not want him to return.

Vasquez nevertheless returned to Kinsley in the first week of December 1998. Robin had moved his belongings to the home of Vasquez' sister, Maria, who lived across the street from Robin; and Vasquez stayed at Maria's after his return from Mexico.

Robin had begun seeing Dinkel, and Vasquez became aware of this fact. According to Vasquez' friend, Nathan Bartley, Vasquez

was upset by his wife's relationship with Dinkel and "wanted to kick Dinkel's ass."

Around December 5, 1998, Vasquez attempted to borrow a gun from Bartley for the stated purpose of going hunting, although Bartley had never known Vasquez to hunt. Vasquez asked Bartley to take him to the store for ammunition. When Bartley was unable to do so, Vasquez went to the store with his sister and purchased 9 mm bullets.

On December 11, 1998, Robin told Police Officer Curtis William Starks that Vasquez was back in Kinsley. When Starks asked Robin if she was frightened, she said that she was not afraid of Vasquez unless he had been drinking. She said there had been a shotgun in her house, which she had taken to Dinkel. Dinkel had locked the shotgun in a safe in his shop so that it was not in her house while Vasquez was in town. Robin also told Starks that she had sought a restraining order against Vasquez and would file a petition for a protection from abuse (PFA) order on the following Monday.

Later in the afternoon on December 11, Starks was called to Dinkel's shop, where Dinkel and Robin gave him a handwritten letter from defendant that had been left on the doorstep. The letter said that Vasquez did not want to "beat anyone" and that he wished Dinkel would stay away so that Vasquez and Robin could work out their problems. Dinkel and Robin also gave Starks the shotgun and a Smith & Wesson .357 handgun. Robin told Starks that Vasquez had brought the handgun into their home several months earlier and would not tell her where he had gotten it. The shotgun belonged to Ron Sebes, who had also kept a Smith & Wesson .357 in his pickup truck until September 1998, when he reported it stolen.

Still later the same afternoon, Starks spoke to Vasquez. Starks told Vasquez that the police had the shotgun, and that Vasquez was not permitted to possess a firearm because of an earlier domestic battery case and because of his immigration status. Starks told Vasquez that the police were going to get the Immigration and Naturalization Service (INS) "involved." He also told Vasquez that Robin had a restraining order against him; that she was filing for

divorce; that she was happy with Dinkel; and that Vasquez needed to leave her alone.

Late the evening of December 11, Vasquez told his sister that he needed to "talk to Robin." He gave his sister a hug, which he did not normally do, and walked from her house to Robin's. He did not come back that night, and the bodies of Robin, Franks, and Dinkel were found the next morning.

Forensic pathologist Corrie May, M.D., testified that Franks suffered blunt force trauma and two gunshot wounds to his head, fired from intermediate range. Dinkel's death was caused by two gunshot wounds to the head and neck, but he suffered a number of blows to the head and neck, which probably incapacitated him before the fatal shots were fired. Robin sustained defensive gunshot wounds to her hand; an atypical gunshot wound to her left shoulder, received while she was hiding behind or under a table; and finally, a shot to the back of her neck.

KBI Special Agent Roger Butler, a bloodstain analyst, testified that the crime scene was consistent with a theory that each victim was executed with an "insurance shot" after being felled and incapacitated by gunshot wounds.

Mike Sebes, who had reported that his 9 mm Firestar was missing when he looked for it after learning of the murders, testified that, in the first few days of December, Vasquez had called him looking for work. After completing a day-long job, Vasquez borrowed Mike's truck. At the time, Vasquez was aware that Mike kept the gun behind the seat in the truck.

Police recovered a box of 9 mm ammunition from Vasquez' sister's house; eight rounds were missing from it.

Over a defense objection, the State also introduced evidence that, on July 17 or 18, 1998, the police had responded to a hang-up 911 call from the Vasquez home. According to responding officers Starks and Tammy Gross, Robin told them that Vasquez, who had been drinking, shoved her, threw her around, and bit her hard on her left breast. The police arrested Vasquez for domestic battery and disorderly conduct. At trial on these cases, Vasquez also objected to evidence that Robin had filed to obtain a PFA

order as a result of the July 1998 incident. The PFA action was later dismissed.

Several of Robin's close friends testified to remarks Robin had made about her turbulent relationship with Vasquez. Defendant made a continuing hearsay objection to this testimony.

Mickey Avery, with whom Robin worked, testified about a letter from Vasquez that Robin had shown her. In the letter, Vasquez stated that he did not want Robin to divorce him and that life would not be worth living if he was not married to her. Avery also testified that, at work on December 11, 1998, Robin received a phone call from Vasquez, who wanted her to meet him. Robin suggested a public meeting place. Avery testified that, although she did not hear Vasquez' side of the conversation, she heard Robin tell him, " 'This isn't Mexico, and you cannot get a gun and shoot people.' " After the call, Robin repeated to Avery what she had told Vasquez.

Robin's friend and former coworker, Virginia Lee Smith, testified that she talked to Robin on December 11, 1998, and Robin mentioned that defendant was back in town. Smith asked Robin if Vasquez knew about Dinkel. Robin said yes and said that Vasquez had said he " 'was going to shoot [Dinkel] in the head.' "

Vasquez, through the aid of an interpreter, testified that he was innocent of the murders. He said that Robin had been married previously, that her former husband had kidnapped her, and that he had beaten her so badly while she was pregnant that she had lost the child. He said that Robin was afraid of her former husband and, in the summer of 1998, decided she needed a gun to protect herself. Vasquez testified that he purchased, from a friend, the Smith & Wesson .357 that was later determined to have been stolen from Ron Sebes. Vasquez admitted that he had bitten Robin in play in July 1998 and that she had become angry. He maintained that he and Robin did not have marital problems. He said he stayed with his sister when he returned to Kinsley from Mexico because Robin's father and son were staying with her and she wanted to be alone with them. Vasquez testified that he and Bartley had planned a hunting trip and that he believed Bartley had a 9 mm handgun they would use; Vasquez therefore purchased a box of 9 mm bullets.

By the night of the murders, defendant testified, Starks had talked to him and made him realize his marriage was over. He said Starks had told him he should get out of town. He said he went to Robin's house that night and knocked, but no one was home; so he hugged his sister, walked to Highway 183, hitchhiked south through El Paso, and caught a bus to Durango, where his brother picked him up and took him to his farm in Mexico.

The district judge did not give a limiting instruction on K.S.A. 60-455 evidence; there was no objection from the defense. The district judge declined to give an instruction on the lesser included offense of voluntary manslaughter based on heat of passion, which the defense had proposed.

At sentencing, the State argued for hard 40 sentences on the three murders. The district judge imposed the hard 40 sentences sought, ruling that the victims were murdered in an especially heinous, atrocious, and cruel manner. The judge relied upon each victim suffering serious pain, physical abuse, and mental anguish before his or her death, and on Vasquez' firing of execution-style shots to ensure their deaths. The heinous, atrocious, cruel aggravator outweighed Vasquez' only mitigator, *i.e.*, the lack of a significant criminal history.

### *Admission of Evidence about July 1998 Incident*

Vasquez argues that the district judge erred in admitting evidence about the July 1998 incident in which he had pushed and bitten Robin. He suggests that this court has disallowed admission of marital discord evidence of this type as an exception to the procedure employed under K.S.A. 60-455. See *State v. Gunby*, 282 Kan. 39, 47-60, 144 P.3d 647 (2006). He also argues that the evidence was irrelevant and unduly prejudicial and that the absence of an appropriate limiting instruction requires reversal of his convictions.

Vasquez is correct that evidence of marital discord qualifying as another crime or civil wrong is subject to evaluation for admission under K.S.A. 60-455 rather than independent of it. The evidence at issue here—testimony about Vasquez' commission of domestic

battery of Robin—unquestionably qualifies as evidence of another crime or civil wrong.

K.S.A. 60-455 provides in pertinent part:

"[E]vidence that a person committed a crime or civil wrong on a specified occasion . . . is inadmissible to prove his or her disposition to commit [a] crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but . . . such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity[,] or absence of mistake or accident."

One of our most recent cases focusing on K.S.A. 60-455 evidence is *State v. Reid*, 286 Kan. 494, 186 P.3d 713 (2008). In *Reid*, we clarified the analytical steps to be taken and the standard of appellate review to be applied to each step.

"[T]he K.S.A. 60-455 analysis requires several steps. . . . [T]he court must determine that the evidence is relevant to prove a material fact, *e.g.*, motive, knowledge, and identity. The court must also determine that the material fact is disputed. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in. [Citations omitted.]" 286 Kan. at 503.

Referencing our 2006 decision in *Gunby*, 282 Kan. at 47-48, 56-57, which did away with marital discord as an independent basis for admission of other crimes and wrongs evidence, *Reid* made clear that it was refining and extending the *Gunby* discussion:

"While *Gunby* established that evidentiary rules may be applied either as a matter of law or in the exercise of the trial court's discretion, depending on the contours of the rule in question, this particular determination only occurs '[o]nce relevance is established.' 282 Kan. at 47. *Gunby* did not establish our standard of review for analyzing relevance of certain K.S.A. 60-455 evidence.

"[T]he legislature has defined 'relevant evidence' as 'evidence having any tendency in reason to prove any material fact.' This statutory definition bears some resemblance to one found in Federal Rule of Evidence 401: ' "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'

"Several treatises have recognized that the federal rule contains both a probative, *i.e.*, relevancy, element and a materiality element." *Reid*, 286 Kan. at 504.

Our *Reid* decision then observed that materiality merged into the federal rule on relevancy through inclusion of the " 'requirement that the fact proved must be "of consequence to the determination of the action." . . . . Determining whether evidence is "consequential" depends on the applicable substantive law.' " 286 Kan. at 504-05 (quoting Mueller & Kirkpatrick, Evidence Practice Under the Rules § 4.2, pp. 228-29 [2d ed. 1999]; citing 1 Federal Rules of Evidence Manual, § 401.02[2] [9th ed. 2006] ["Both traditional requirements of relevance analysis—that evidence must relate to issues that are properly in dispute and that it must shed some light on those issues—are combined into one rule. Whether an issue is properly in dispute is, of course, determined by the applicable substantive law."]).

The Kansas statute, K.S.A. 60-401(b), mirrors its federal counterpart. As *Reid* stated, " 'Evidence having any tendency in reason to prove' suggests the probative element, while 'any material fact' suggests the materiality element." *Reid*, 286 Kan. at 505. Moreover, both elements have a place under K.S.A. 60-455 because of the statute's references to both relevance—*i.e.*, probativeness—and materiality. 286 Kan. at 505. In other words, the concept of relevance under Kansas law includes both whether evidence is probative and whether it is material.

On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. 286 Kan. at 507-09. With respect to relevance overall, *Reid* concluded: "Obviously, if either the probative or materiality element's standard is not met, then the evidence is inadmissible. If both standards are met, then the appellate court proceeds to the next step(s) in the [K.S.A.] 60-455 analysis established in *Gunby*." *Reid*, 286 Kan. at 509.

The second step under K.S.A. 60-455, *i.e.*, whether the fact was in issue at trial, is judged on appeal under a de novo standard. An appellate court is as capable as a district court of discerning whether a particular fact was in issue from a cold record. The third step, the district judge's weighing of probative value and prejudicial effect, is reviewed on appeal for abuse of discretion, a more deferential standard. See *Reid*, 286 Kan. at 512.

If evidence qualifies for admission under K.S.A. 60-455 but no limiting instruction was given, the standard of review should match that applied to other jury instruction issues. If the defense requested a limiting instruction and was refused, or it otherwise objected to its omission by the district judge, the standard on appeal is that set out in K.S.A. 60-261; to be reversible, the error must be inconsistent with substantial justice. See *Gunby*, 282 Kan. at 48, 57-59. If the defense did not request a limiting instruction and it failed to object to its omission, the absence of a limiting instruction is reviewed on appeal under the clearly erroneous standard of K.S.A. 22-3414(3). *Reid*, 286 Kan. at 513. " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred.' [Citation omitted.]" *State v. Shirley*, 277 Kan. 659, 666, 89 P.3d 649 (2004).

At the time of Vasquez' trial, it was accepted practice to admit marital discord evidence independent of K.S.A. 60-455. To avoid error, a district judge need not have followed the three steps under the statute or given a prophylactic limiting instruction. See, *e.g.*, *State v. Mayberry*, 248 Kan. 369, 384-85, 807 P.2d 86 (1991); *State v. Green*, 232 Kan. 116, 119-23, 652 P.2d 697 (1982).

This changed with *Gunby*, 282 Kan. at 49. Yet *Gunby* also unequivocally held that the list of facts in K.S.A. 60-455 was meant to be exemplary rather than exclusive. 282 Kan. at 56. Since *Gunby*, then, marital discord evidence could be admissible to demonstrate motive for a crime or some other fact, as long as the three-part test under K.S.A. 60-455 was met and a limiting instruction given. 282 Kan. at 56-57. In addition, we stated: "[T]the admission of K.S.A. 60-455 evidence without the explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, or prophylactic limiting instruction is not inevitably so prejudicial as to require automatic reversal. On the contrary it may be harmless." *Gunby*, 282 Kan. at 57; see K.S.A. 60-261.

*Gunby* applies to this case, which was on direct appeal at the time *Gunby* was filed. See *United States v. Booker*, 543 U.S. 220, 268, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005) (citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 107 S. Ct. 708

[1987]); *State v. Francis,* 282 Kan. 120, 126-27, 145 P.3d 48 (2006); *State v. Barnes,* 278 Kan. 121, 124-27, 92 P.3d 578 (2004). Thus it is clear that the district judge in Vasquez' case erred, albeit innocently, by admitting marital discord evidence independent of K.S.A. 60-455. We must evaluate the effect of that error, if any. To do so, we must examine whether the evidence would have been admissible if the three-part test of K.S.A. 60-455 had been applied correctly. If so, because Vasquez did not seek a limiting instruction and none was given, we must next examine whether the absence of the instruction amounted to clear error requiring reversal.

Vasquez argues that the evidence of the July incident fails the three-part test because it was not relevant to prove any material fact in issue at his triple murder trial. We disagree.

Addressing the legal question of the materiality element of relevance first, we hold that motive was clearly material to the jury's task in this triple murder trial. Although motive is not an element of premeditated first-degree murder, evidence of its existence can be highly persuasive circumstantial evidence of guilt. It is the "moving power that impels one to action for a definite result." *Reid,* 286 Kan. at 504 (citing *State v. Jordan,* 250 Kan. 180, 190, 825 P.2d 157 [1992]). It " 'supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case.' " *Reid,* 286 Kan. at 504 (quoting *State v. Engelhardt,* 280 Kan. 113, 128, 119 P.3d 1148 [2005]); see also *State v. Hughes,* 286 Kan. 1010, 1021-23, 191 P.3d 268 (2008); (discussing motive); *State v. Carapezza,* 286 Kan. 992, 998-1000, 191 P.3d 256 (2008) (same). Here, the State attempted to prove that Vasquez killed out of anger and jealousy, *i.e.,* that he had a motive to kill his wife because of the separation she instigated and her new romantic relationship with Dinkel.

The question of whether the evidence of the July 1998 domestic battery incident was probative on motive is somewhat more difficult, because the incident was fairly remote in time from the murders. However, that temporal remove is ameliorated by the fact of Vasquez' absence from the country for several weeks. It is also

ameliorated by our recognition that anger and jealousy in troubled romantic relationships are not necessarily logical or linear. Neither are they strictly time-bound. Rather, these volatile emotions may wax and wane; they may build over time or be tamped down by sudden or slow reconciliation. In the circumstances before us, the district judge's decision to permit the State to prove motive by demonstrating the existence of discord between Vasquez and Robin in the several months leading to the murders would not have been an abuse of discretion.

Employing a de novo standard, our review of the record also demonstrates there would have been no error in deciding that motive was actually in issue in Vasquez' trial. As mentioned, the State's theory was that Vasquez killed out of anger and jealousy. His testimony directly contradicted that theory. He advanced an alternate explanation for why he was staying at his sister's home after his return from Mexico and denied that he and Robin had marital problems of any kind.

We move next to the balance of probative value and prejudicial effect. On this part of the test, it is not enough for Vasquez to show that the evidence was prejudicial. It undoubtedly was, as is all or most of the evidence introduced by the State in any murder trial. See *State v. Miller*, 284 Kan. 682, 703, 163 P.3d 267 (2007). Rather, to demonstrate an abuse of discretion, he must show that unfair or undue prejudice arising from the admission of the evidence substantially outweighed its probative value. Vasquez cannot do so here. The State put on convincing circumstantial proof of Vasquez' guilt; it included ample evidence of his estrangement from Robin. Under these circumstances, the July incident did not give the jury its sole or even a predominant independent reason to convict Vasquez. Had the district judge conducted this balance under K.S.A. 60-455, it would not have been an abuse of discretion for him to conclude that the evidence could come in. Indeed, the contribution of this evidence to the ultimate verdicts was most likely minimal.

Finally, we address the absence of a limiting instruction under the clearly erroneous standard. Given our expectation of minimal impact from this evidence, we have no hesitation in holding that the absence of a limiting instruction in this case was not clear error.

An instruction telling the jury that it could consider the July incident only to the extent it was probative of motive or another particular fact in issue would have improved Vasquez' trial, but the trial was fair and its result reliable without it.

### Instruction on Voluntary Manslaughter

Defendant argues that the district court erred in failing to give his requested instruction on voluntary manslaughter based on heat of passion, a lesser included offense of premeditated first-degree murder. Noting that evidence relating to mitigation in the form of heat of passion was "scant" and "minimal at best," the district court declined to include the instruction because Vasquez' defense was that he had not entered Robin's house at all on the night of December 11, 1998, and thus could not have committed the murders or other charged crimes.

" ' " 'If the defendant requests [lesser included offense] instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive.' [Citation omitted.] An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented." ' [Citation omitted.]" *State v. White*, 284 Kan. 333, 347, 161 P.3d 208 (2007) (quoting *State v. Boyd*, 281 Kan. 70, 93, 127 P.3d 998 [2006]; *State v. Drennan*, 278 Kan. 704, 712-13, 101 P.3d 1218 [2004]).

K.S.A. 21-3403 defines voluntary manslaughter as "the intentional killing of a human being committed: (a) [u]pon a sudden quarrel or in the heat of passion." The key elements for this offense are whether the killing was intentional and whether there was legally sufficient provocation. See *State v. Hamons*, 248 Kan. 51, 63, 805 P.2d 6 (1991). The Kansas rules for determining whether heat of passion and sufficient provocation existed to support a voluntary manslaughter conviction, detailed in *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 (1985), are:

"(1) Voluntary manslaughter is the intentional killing in the heat of passion as a result of severe provocation. . . .

"(2) 'Heat of passion' means any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror. Such emotional state of mind must be of

such a degree as would cause an ordinary man to act on impulse without reflection. [Citations omitted.]

"(3) In order to reduce a homicide from murder to voluntary manslaughter, there must be provocation, and such provocation must be recognized by the law as adequate. A provocation is adequate if it is calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason. [Citation omitted.] In order for a defendant to be entitled to a reduced charge because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation. [Citations omitted.]

"(4) The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason. [Citations omitted.] In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant. The fact that his intelligence is not high and his passion is easily aroused will not be considered in this connection. [Citation omitted.]

"(5) Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered. [Citations omitted.]" 236 Kan. at 796-97.

With these guiding principles in mind, the court must determine here whether there was sufficient evidence of adequate provocation to instruct on voluntary manslaughter. In doing so, this court views the evidence in the light most favorable to the defendant. *State v. Horn*, 278 Kan. 24, 40, 91 P.3d 517 (2004); *State v. McClanahan*, 254 Kan. 104, 109, 865 P.2d 1021 (1993).

In this case, there was no such evidence from Vasquez. This is not surprising, given his version of events. He could not have credibly claimed simultaneously that he was not inside the house at all and that he was inside and had been provoked into committing a triple homicide. See *McClanahan*, 254 Kan. at 113-14.

Vasquez nevertheless argues that the admitted evidence could have led jurors to conclude that, if he committed the crimes, he was acting out of heat of passion. He points to testimony that he had recently learned Robin was divorcing him; that she was seeing another man; that she had given a gun Vasquez possessed illegally to the police; and that the police planned to contact INS.

Even if all of this evidence was credited by the jury, these facts do not "meet the provocation threshold—that which is calculated

to deprive a reasonable [person] of self-control and to cause [the defendant] to act out of passion rather than reason." *Horn*, 278 Kan. at 42; see *State v. Oliver*, 280 Kan. 681, 705, 124 P.3d 493 (2005); *Engelhardt*, 280 Kan. at 135-36. On the contrary, this evidence provided strong support for the factors we have recognized as persuasive on the premeditation element of first-degree murder. See *Oliver*, 280 Kan. at 704-05. In addition, the weapon used was deadly, a 9 mm gun. Vasquez had illegally obtained such a weapon and had purchased 9 mm ammunition more than a week before the murders. He had made threats against at least one of the victims. He hugged his sister and told her goodbye—an unusual parting, according to her—before he went to Robin's house. There was evidence of defensive wounds on Robin, and additional and lethal injuries were inflicted after each of the victims had been felled. Premeditation and heat of passion are mutually exclusive concepts. *State v. Hurt*, 278 Kan. 676, 683, 101 P.3d 1249 (2004); see *State v. Abu-Fakher*, 274 Kan. 584, 609, 56 P.3d 166 (2002). An instruction on voluntary manslaughter based on heat of passion was not warranted in this case.

### Admission of Victim's Hearsay Statements

Vasquez also argues that the State's reliance on Robin's inadmissible hearsay statements to prove motive violated his right of confrontation, requiring reversal of his convictions. As the State noted in its brief, Vasquez did not specify exactly which testimony he contests, but his brief cites to a passage in the record containing testimony from Starks about his first conversation with Robin on the day of the murders. We therefore address only this testimony.

This court's analysis under the Confrontation Clause of the Sixth Amendment to the United States Constitution is undertaken without deference to the trial court's interpretation of the law. *State v. Davis*, 283 Kan. 569, Syl. ¶ 1, 158 P.3d 317 (2006).

The Sixth Amendment provides that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her. U.S. Const. amend. VI. The Kansas Constitution also protects a criminal defendant's right to confront the witnesses against him or her. Kan. Const. Bill of Rights, § 10.

However, these provisions do not preclude the admission of all out-of-court statements. See *Davis*, 283 Kan. at 576.

After the United States Supreme Court's decisions in *Davis v. Washington*, 547 U.S. 813, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), and *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the test to determine whether the admission of a hearsay statement violates a defendant's confrontation rights turns first on whether the statement is testimonial. If a statement is testimonial, it must be excluded unless the court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant. If a statement is not testimonial, then it does not implicate the Confrontation Clause, and the only consideration before the court is whether it may be admitted under one of the statutory exceptions to Kansas hearsay law. *Davis*, 283 Kan. 569, Syl. ¶ 2.

"In determining whether a statement is testimonial, an appellate court applies an objective, totality of the circumstances test." *State v. Henderson*, 284 Kan. 267, Syl. ¶ 4, 160 P.3d 776 (2007).

In *State v. Brown*, 285 Kan. 261, 282-94, 173 P.3d 612 (2007), we engaged in an extended review of the language in the Supreme Court's *Davis* and *Crawford* opinions and of our interpretations of the word "testimonial" in *State v. Miller*, 284 Kan. 682, 709-13, 163 P.3d 267 (2007); *Henderson*, 284 Kan. at 276-95; and *State v. Lackey*, 280 Kan. 190, 201, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006). We concluded with the following attempt at synthesis:

"[T]he various factors considered . . . for determining whether a hearsay statement is testimonial include:

"(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?

"(2) Was the statement made to a law enforcement officer or to another government official?

"(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

(a) the declarant was speaking about events as they were actually happening, instead of describing past events;

(b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency;

(c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

(d) the interview was part of a governmental investigation?; and

"(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?" *Brown*, 285 Kan. at 291.

When the totality of circumstances surrounding Robin's first statements to Starks on the day of her murder are measured against these factors, the statements do not qualify as testimonial. Although they were made to a police officer and not during an ongoing emergency, they took the form of a fairly casual update. Robin let Starks know that Vasquez was back in town and that she intended to file a PFA action. The situation would not have led Robin to believe that the statements would later be available for use in the prosecution of a crime, and investigation of a crime was not Starks' purpose in responding to the information. Admission of Starks' testimony about Robin's statements therefore did not violate Vasquez' right to confront the witnesses against him.

We next move to the question of whether Starks' testimony about these statements by Robin was admissible under Kansas hearsay rules.

According to Starks, Robin approached him and wanted to visit. She told him that Vasquez was back in town, and she answered Starks' questions about whether she was afraid. She said that Vasquez was violent when drunk and that she had told him she did not want him to come back from Mexico. She also said that there had been a shotgun in her house but that she had taken it to Dinkel's shop because she did not want Vasquez to have access to it. She told Starks that Vasquez was staying at his sister's house; that Robin had arranged to have a restraining order filed; and that she was going to file a PFA action the following Monday.

We hold that the testimony was admissible under K.S.A. 60-460(d)(3), which permits admission of hearsay when the declarant is unavailable to testify at trial and the statements were made at a

time when the declarant had recently perceived the matter, while the declarant's recollection was clear, and the statement was made in good faith prior to the commencement of the action, with no incentive to falsify or distort.

As noted above, the district judge admitted the testimony because of the forfeiture doctrine. We do not today address that doctrine. In any event, the judge's ruling can be affirmed, if it is right even for the wrong reason. See *State v. Bryant*, 272 Kan. 1204, 1210, 38 P.3d 661 (2002).

### Sufficiency of Evidence on Aggravated Burglary

The State's complaint charged Vasquez with aggravated burglary through the alternative means of entering into or remaining within Robin's house without authority; the jury instructions allowed conviction only on the "entering into" alternative. Vasquez argues the State failed to present evidence that he lacked authority to enter the house, which he and Robin had shared as husband and wife before his extended stay in Mexico.

When the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, examined in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Morton*, 283 Kan. 464, 474, 153 P.3d 532 (2007) (quoting *State v. Kesselring*, 279 Kan. 671, 679, 112 P.3d 175 [2005]; *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 [2003]).

Aggravated burglary is defined in K.S.A. 21-3716 as "knowingly and without authority entering into or remaining within any building . . . in which there is a human being, with intent to commit a felony . . . therein." "Entering into" refers to the situation where a defendant enters without authorization. *State v. Williams*, 220 Kan. 610, 612-13, 556 P.2d 184 (1976); *State v. Brown*, 6 Kan. App. 2d 556, Syl. ¶ 4, 630 P.2d 731 (1981).

Our opinion in *State v. Franklin*, 280 Kan. 337, 345-46, 121 P.3d 447 (2005), is helpful in deciding this issue. In that case, a majority of this court reversed the aggravated burglary conviction of a former live-in girlfriend who entered her former boyfriend's residence

and attacked his current paramour. 280 Kan. at 346-48. Evidence of lack of authority was insufficient when the defendant had testified that she had permission to be in the residence, and that she had clothes in the residence and a car in its garage. In response, the State had relied on the timing of the attack, 1:54 a.m., as well as the defendant's lack of conversation with residents on the night of the attack, her estrangement from the boyfriend, and her failure to visit the residence in the previous several weeks.

Viewing all of the evidence in this case in the light most favorable to the prosecution, the State certainly demonstrated that Robin wanted nothing to do with Vasquez. She had asked him to stay in or go back to Mexico; and she had moved at least some of his belongings out of their house and into his sister's. Yet the State did not prove that on December 11, 1998, Vasquez was legally unauthorized to enter the house he and Robin had lived in together. Robin may have obtained a restraining order or may have planned to file a PFA action, as she told Starks, but there was no evidence that Vasquez had been served with any order of this type. He was still married to Robin. Although Starks' discouragement of contact with Vasquez' wife was good advice, it lacked the force of law. In keeping with our *Franklin* decision, we hold that the evidence at trial was insufficient to show Vasquez lacked authority to enter Robin's house. His conviction on aggravated burglary must therefore be reversed and its corresponding sentence vacated.

### Cumulative Error

Vasquez' last challenge to his convictions is that the substantial prejudice of cumulative trial errors denied him the right to a fair trial. Cumulative trial errors, when considered collectively, may be so great as to require reversal of a conviction; the test is whether the totality of circumstances substantially prejudiced the defendant and denied him or her a fair trial. *State v. Gunby*, 282 Kan. 39, 66-67, 144 P.3d 647 (2006).

As to Vasquez' murder and aggravated robbery convictions, we do not detect multiple errors. Thus the cumulative error rule has no application in this case.

## Hard 40 Sentence

Vasquez also argues that Kansas' hard 40 sentencing scheme is unconstitutional, because it does not afford criminal defendants the right to a jury determination beyond a reasonable doubt of all facts that may increase the maximum penalty for a conviction of first-degree murder. He also argues that the district judge erred in imposing hard 40 sentences under K.S.A. 21-4635 and K.S.A. 21-4636(f) because the evidence was insufficient to support the judge's ruling that the murders were committed in an especially heinous, atrocious, or cruel manner.

Vasquez' constitutional argument has been considered and rejected by this court many times. See, *e.g.*, *State v. Albright*, 283 Kan. 418, 423-25, 153 P.3d 497 (2007); *State v. Conley*, 270 Kan. 18, 35-36, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Judicial fact finding by a preponderance of the evidence "that exposes a defendant to a sentence in excess of the statutory maximum" violates a defendant's constitutional rights; but "judicial fact finding utilizing a preponderance of the evidence standard to increase the mandatory *minimum* sentence does not run afoul of the jury trial guarantee." *State v. Johnson*, 284 Kan. 18, 22-23, 159 P.3d 161 (2007), *cert. denied* 169 L. Ed. 2d 737 (2008) (citing *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856 , 127 S. Ct. 856 [2007]; *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 [1986]). The maximum sentence for first-degree murder is life in prison. K.S.A. 21-4706(c). The hard 40 sentence stiffens the minimum sentence that must be served but does not expose a defendant to a higher maximum than that provided by statute.

Vasquez' challenge to the sufficiency of the evidence to support the "heinous, atrocious, or cruel" aggravator also is without merit. Our standard of review is " 'whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' " *State v. Washington*, 280 Kan. 565, 568, 123 P.3d 1265 (2005), *cert. denied* 549 U.S. 1018 (2006). Here, on the "heinous, atrocious, or cruel"

aggravator, the district judge noted that each victim "suffered serious pain and physical abuse," including "mental anguish, both in the form of certainty and uncertainty" on his or her "ultimate fate." Viewed in the light most favorable to the prosecution, the evidence supports this finding. See *Washington*, 280 Kan. at 568. Each victim suffered brutal, incapacitating blows, either by blunt force or by gunshot, to the head and/or neck. Robin, in particular, was wounded while she was hiding behind or under a table. Once each of the victims was felled, execution-style shots were fired to ensure death.

We also note, in closing, that the State alleged and the district court found three additional aggravating factors present: Vasquez purposefully killed more than one person; he committed the crimes to avoid lawful arrest or prosecution; and he committed the crimes for the purpose of receiving money or other things of monetary value. Even if Vasquez was entitled to relief because the evidence on the "heinous, atrocious, or cruel" aggravator was insufficient, the sentence was adequately supported by the multiple purposeful killings and the absence of outweighing mitigating evidence.

### Additional Issues in Pro Se Brief

We have carefully reviewed each of the additional issues raised by Vasquez in his pro se brief. None entitles him to relief not already outlined earlier in this decision.

### Conclusion

In light of all of the foregoing discussion, Vasquez' murder, aggravated robbery, felony theft, and misdemeanor theft convictions and their corresponding sentences are affirmed. His aggravated burglary conviction is reversed, and its corresponding sentence is vacated.

Affirmed in part and reversed in part.

DAVIS, J., not participating.

GREENE, J., assigned.