IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,537

STATE OF KANSAS,
*Appellee,*

v.

AHMAD K. BEY,
*Appellant.*

SYLLABUS BY THE COURT

1.

Hearsay is generally inadmissible unless an exception identified in K.S.A. 60-460 applies. One such exception is the "necessity exception" in K.S.A. 60-460(d)(3). It applies when the district court finds that (1) the declarant is unavailable; (2) the declarant made the statement at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear; and (3) the declarant made the statement in good faith prior to the commencement of the action and with no incentive to falsify or to distort.

2.

K.S.A. 60-455(a) generally prohibits courts from admitting evidence of a person's prior crimes or civil wrongs to prove that person's propensity to commit a crime or civil wrong on another occasion. But under K.S.A. 60-455(b), such prior bad-acts evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

3.

Evidence that a defendant threatened the deceased is generally relevant to show motive and intent.

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Oral argument held December 16, 2025. Opinion filed March 13, 2026. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Julie A. Koon*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: Melinda Sprague disappeared on Christmas Eve. Her body was found two days later in the trunk of her car. A jury later convicted her boyfriend, Ahmad K. Bey, of first-degree premeditated murder and criminal possession of a firearm.

Before her murder, Sprague told her family and coworkers that Bey was abusing her and had threatened to kill her. And the State's case against Bey relied heavily on other witnesses' testimony about Sprague's statements. On appeal, Bey argues that her statements were inadmissible under the rules of evidence—both as hearsay and prior bad-acts evidence.

But the district court's evidentiary rulings were legally sound. Sprague's out-of-court statements were hearsay, and hearsay is generally inadmissible. But there are several exceptions to this general rule, and the challenged testimony met the necessity exception under K.S.A. 60-460(d)(3). And while Sprague's statements described Bey's

2

prior bad acts, they were admissible under K.S.A. 60-455 because they were relevant to several disputed material facts, including motive, intent, premeditation, and the nature of Sprague and Bey's relationship.

Bey raises two other alleged errors. First, he argues the prosecutor erred by using a puzzle analogy during closing argument. But the prosecutor's analogy was an appropriate attempt to explain the viability of circumstantial evidence. Second, he argues the cumulative effect of the alleged trial errors deprived him of a fair trial. But since no error occurred, Bey's cumulative-error claim necessarily fails. Thus, we affirm Bey's convictions.

FACTS AND PROCEDURAL BACKGROUND

Bey met Sprague through a prison pen pal program. At the time, Bey was serving a felony sentence. The two began dating when Bey was paroled in July 2019. And in the six months leading up to Sprague's murder, her family and coworkers learned of the discord in their relationship.

Sprague told her cousin, Angela Canevit, that Bey was physically and emotionally abusive. Sprague said that Bey would make her do things she didn't want to do. And he would threaten to kill her if she didn't do what he wanted. Canevit saw Sprague with black eyes, a busted lip, and a swollen nose in June or July 2019. Sprague also went to Canevit's house in September 2019 to hide from Bey. But Sprague later returned home.

Sprague told her coworker, Talisha Cave, that Bey would get violent towards her when they argued. Sprague talked about getting a protection-from-abuse order. She never did because Bey had threatened to kill her if she ever left him or if she ever called the police on him. Sprague said she was afraid to leave Bey because of these threats.

3

Sprague also told her supervisor, Julie Knight, that Bey was abusive. Sprague said that if she ever died, Bey would be the one to kill her. Knight had seen bruises on Sprague's neck and arms. And Knight remembered a time when Sprague said Bey had strangled her and revealed the bruises on her neck.

A month before Sprague's murder, her son, Nathan Corona, went to her home. No one answered when he knocked on the door, so he let himself in. He found Sprague and Bey in a room together. Sprague was crying and disclosed that Bey had strangled her. She warned Nathan not to do anything because Bey had a gun.

On the morning of December 23, Sprague showed up to work visibly upset. She told a coworker, Cherelle Anderson, that she was fed up with her relationship with Bey. But Sprague feared if she left him, he would kill her and "she would end up in the river."

That same day, Sprague told another coworker, Jamie Johnson, about the turmoil in her relationship. Sprague said she was scared to go home because she had argued with Bey, and he had threatened to kill her. Johnson asked if Sprague had called the police. Sprague said she hadn't because she was afraid Bey would find out and the police couldn't protect her.

Knight let Sprague leave early that day because work was slow. But when Knight left around 4 or 5 p.m., Sprague was still sitting in the lobby. Sprague seemed upset. She said Bey had her car and she was waiting for him to come pick her up. Security footage from the lobby shows Sprague eventually left around 7 p.m.

Sprague sent a text message to Bey's cell phone at 11:42 p.m. on December 23. That was the last activity on Sprague's phone.

4

The next day, Sprague was scheduled to work at 10 a.m. but she never showed. Knight tried calling Sprague and reached out to her on Facebook but got no response. Knight also sent a coworker to Sprague's house, but the coworker was unable to contact Sprague. Knight then notified police. Two of Sprague's family members also reported Sprague missing.

Officers went to Sprague's home around 2 p.m. on December 24. No one answered. All the windows were covered and there were no signs of forced entry. Police also saw blue nitrile gloves on the ground near the trash can at the curb.

Knight told police about Sprague's tumultuous relationship with Bey. Police tried to contact Bey at his home but had no luck.

Sprague's other son, Dominick Corona, called Bey later that day. Bey said he had driven Sprague's car to her house earlier, but no one was home. Bey said he took a nap inside while waiting for Sprague. When he woke up, someone had stolen Sprague's car with Sprague's house key inside. Bey said he then left and had not seen Sprague since. Dominick relayed this information to police and said he thought Sprague was in danger.

Officers returned to Sprague's home and entered through an unlocked door. They saw gifts sitting on the kitchen counter and a turkey thawing in the kitchen sink. The plastic wrap around the turkey had expanded, suggesting the turkey had started to decompose. Police also saw what appeared to be coagulated blood at about head height on the living room couch. And it appeared as if someone had tried to clean off the blood.

Officers asked Dominick if Sprague had any weapons. Dominick said Sprague didn't have any weapons, but she had said Bey had a firearm.

Two days later, police found Sprague's black Ford Focus parked at Harry and Ellis Streets in Wichita. Sprague's body was wrapped in blankets inside the trunk. She had been killed by a single gunshot to the neck.

Police recovered surveillance video from a business near Harry and Ellis Streets. It showed a woman parking Sprague's car at 4:30 p.m. on December 24 and walking away. No one else is seen approaching the car before police discovered it on December 26.

The woman in the video was identified as Vanessa Waner. Police later learned that Waner was living with Bey. The two were also in a romantic relationship.

Police found an empty package of nitrile gloves in Sprague's car. They also swabbed the car for DNA. Bey could not be excluded as a major contributor to a DNA sample taken from the car trunk's interior lower edge.

While searching Sprague's home, police discovered a bullet hole in the living room couch and a bullet inside the couch. Police also sprayed the home with luminol. Luminol reacts with biological substances like blood and glows blue in dark light. Police found luminol reactions on the living room couch, on a bucket sitting on the carpeted floor of the living room, and on the carpet by the bucket.

Police also spoke to Bey's neighbor, Treyrese Dickson. Dickson said that shortly before 10 a.m. on December 24, Bey asked Dickson to follow Bey, who was driving a black Ford, to Sprague's house. Dickson agreed but said he needed to stop to get gas, so Bey gave Dickson directions. When Dickson arrived at Sprague's, Bey had already parked the black Ford in the driveway and was inside the house. Dickson remained in his car. Bey came outside several minutes later and said Sprague was not there. They each left in their respective cars.

6

Surveillance video recovered from Sprague's neighbor confirmed Dickson's account and that Bey had driven Sprague's car to her house. That surveillance video also showed that Bey had been at Sprague's home the evening of December 23.

Police were unable to use cell-phone-tower-location data for Bey's cell phone because a recordkeeping error made that data inaccurate. Police were also unable to retrieve text messages from Bey's phone because the service provider had already purged them from its records.

But police did recover cell-phone-tower-location and text-message data for Waner's cell phone. Those records showed that Waner appeared to travel from an area near Bey's home to an area near Sprague's home around 2 a.m. on December 24. Waner then headed northwest toward a Walmart Supercenter. She then returned to an area near Sprague's home around 3 a.m. Between 3 a.m. and 8:40 a.m., Waner appeared to go back and forth between Sprague's home and Bey's home several times.

Waner and Bey exchanged multiple phone calls during this time. They exchanged five phone calls while Waner was near the Walmart Supercenter between 2:10 a.m. to 2:40 a.m. At 2:56 a.m., Waner texted Bey, "Front or back?" before apparently returning to Sprague's home at around 3 a.m. Waner and Bey also exchanged three phone calls in the half hour before Waner abandoned Sprague's car at Harry and Ellis Streets and two calls in the half hour after.

Phone records also showed Sprague texting with someone using Waner's cell phone on the morning of December 23. And the messages suggested that person was Bey. In the texts, Sprague refused to let Bey have her car. Bey responded, "Bitch," followed by "I'll let you see what I'm on," "Since you so fucking smart," and, "Fuck yo conversation."

7

A jury convicted Bey of first-degree premeditated murder and criminal possession of a firearm by a convicted felon. The district court sentenced Bey to a controlling term of life in prison with no possibility of parole for 50 years.

Bey appealed directly to our court. We have jurisdiction because Bey was convicted of an off-grid crime and he was sentenced to life imprisonment. See K.S.A. 22-3601(b)(3)-(4); see also K.S.A. 21-5402 (first-degree murder is an off-grid crime). We heard oral argument from the parties on December 16, 2025.

ANALYSIS

Bey raises four issues on appeal. First, he contends that the district court erred by admitting hearsay statements Sprague made about Bey. Second, he argues Sprague's statements also should have been excluded as prior bad-acts evidence. Third, he claims that the prosecutor erred by using a puzzle analogy during closing argument. Finally, he alleges that the cumulative effect of these errors deprived him of a fair trial. We address his issues in turn and conclude that none establish error.

I. *The district court did not err when it admitted evidence of Sprague's out-of-court statements because those statements met a hearsay exception identified in K.S.A. 60-460.*

At trial, the State called several witnesses who testified to out-of-court statements Sprague made about Bey. These statements included:

- Sprague told Canevit that Bey was physically and emotionally abusive and he forced her to do things she did not want to do. Sprague also said Bey would threaten to kill her if she did not do what he wanted, and she feared Bey.
- Sprague told Canevit that Bey would get violent when the couple argued. Sprague also said Bey had threatened to kill her if she left him or if she called the police, and she was afraid to leave Bey because of these threats.

8

- Sprague told Knight that Bey was abusive and that if Sprague ever died, Bey would be the one to do it.
- When Nathan walked in on Sprague and Bey, Sprague was crying and she told Nathan not to do anything because Bey had a gun.
- Sprague told Nathan and Knight that Bey had strangled her.
- Sprague told Anderson she was afraid that Bey would kill her and she would end up in the river if she left him.
- Sprague told Johnson that she was scared to go home and that Bey had threatened to kill her.
- Sprague told Dominick that Bey had a firearm.

Bey argues that this testimony is inadmissible hearsay. Hearsay is "a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 60-460. Hearsay is generally inadmissible unless an exception identified in K.S.A. 60-460 applies. One such exception is the "necessity exception" in K.S.A. 60-460(d)(3). It applies when the district court finds that (1) the declarant is unavailable; (2) the declarant made the statement "at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear"; and (3) the declarant made the statement "in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 60-460(d)(3).

The district court ruled, both pretrial and after Bey renewed his objections at trial, that the necessity exception applied. See K.S.A. 60-404; *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010) (party must contemporaneously object to admission of evidence at trial to preserve evidentiary challenges for review). We review a district court's admission of evidence under the hearsay rule for abuse of discretion. *State v. Wash*, 320 Kan. 646, 688, 571 P.3d 568 (2025). "A district court abuses its discretion if

9

no reasonable person could agree with its decision or if its exercise of discretion is founded on a legal or factual error." *State v. Richardson*, 316 Kan. 752, 753, 521 P.3d 1111 (2022).

Before turning to the analysis, let's identify Bey's specific challenge under K.S.A. 60-460. There is no dispute that Sprague's out-of-court statements are hearsay. She was not testifying at trial when she made them. And the State offered the statements to prove the truth of the matter asserted—that is, to prove that Bey was physically violent toward Sprague; that Bey had threatened to kill Sprague; and that Bey had a gun. So the dispute centers on whether the necessity exception applies. Bey does not contest that Sprague was unavailable to testify at his trial—the first requirement. Instead, he focuses on the exception's other two requirements. First, he argues the State failed to show that Sprague made the challenged statements after recently perceiving the events described. Second, he claims the State failed to show that Sprague had no incentive to falsify or distort. But after careful review of the record, we find no abuse of discretion.

A. *The district court did not abuse its discretion by finding that Sprague made the out-of-court statements after recently perceiving the matter and while her memory was still clear.*

For the necessity exception to apply, the district court must find that the declarant made the statement "at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear." K.S.A. 60-460(d)(3). But the recently perceived requirement is not a rigid temporal limit. It can "allow for a considerable passage of time, so long as the statement was made at a time when the event could still be reasonably classified as 'recent' and the declarant's memory was still unclouded." *Smith v. Estate of Hall*, 215 Kan. 262, 268, 524 P.3d 684 (1974). Two of our decisions, *State v. Seacat*, 303 Kan. 622, 366 P.3d 208 (2016), and *State v. Evans*, 313 Kan. 972, 492 P.3d 418 (2021), illustrate this point.

10

In *Seacat*, we held that a murder victim's statements to coworkers that her husband had threatened to kill her were admissible under the necessity exception. 303 Kan. at 638. While the evidence did not show the exact timing of the threats relative to the victim's reports of the threats, the intervening period "would have been no more than 4 months and was probably just a matter of days." 303 Kan. at 638. The district court could conclude from this evidence that the victim had recently perceived the threats and her memory of them was still clear. 303 Kan. at 638.

In *Evans*, we also held that a murder victim's statements to coworkers about his discordant relationship with the defendant and threats she had made to kill him were admissible under the necessity exception. 313 Kan. at 986. Like *Seacat*, the evidence in *Evans* did not establish the exact timing of the events and the victim's statements describing those events. But the evidence did show the victim made the statements in the year leading up to the murder. And that evidence supported the district court's recent-perception and clear-memory finding. 313 Kan. at 986-87.

Here, the district court acknowledged some "murkiness" about the timing of Bey's acts and Sprague's statements about them. But relying on *Seacat*, it found Sprague made the statements when she had recently perceived the events and while her memory was still fresh. Bey argues that the district court abused its discretion because there is simply no evidence supporting that finding. We disagree.

The evidence shows that Bey and Sprague began their romantic relationship after he was paroled in July 2019. Witnesses last saw Sprague on December 23 that same year. Bey concedes that Sprague necessarily perceived and reported the events within this six-month window. And this six-month period is consistent with those in *Seacat* and *Evans*.

Two other facts bolster our conclusion on this point.

11

First, the events Sprague perceived were not the sort of humdrum occurrences that constitute much of daily life. Instead, she reported that Bey physically abused her, threatened to kill her, and possessed a gun. Given the events' seriousness, the district court could reasonably infer that they would leave a lingering impression.

Second, many of Sprague's statements were made within weeks, days, or even hours after the perceived event. For example, Sprague told Johnson on December 23 that she was scared to go home because she had argued with Bey and he had threatened to kill her. Context alone suggests this was a recent threat—otherwise, why would Sprague be scared to go home that day? But the text messages between Sprague and Bey on December 23 also showed the couple had been arguing about using Sprague's car that morning. This evidence reasonably suggests Bey threatened Sprague mere hours before she spoke with Johnson.

According to Knight, Sprague also said Bey had strangled her the "night before." Knight's testimony left ambiguity as to whether the "night before" meant last night or the night before Sprague went to her mother's funeral in early December. So Sprague reported the strangulation to Knight at most a couple weeks, and possibly no more than several hours, after it happened.

And Nathan testified he walked in on Bey and Sprague a month before Sprague was murdered. Sprague was crying, and she told Nathan that Bey had strangled her but not to react because Bey had a gun. The evidence reasonably suggests Bey strangled Sprague and she observed his gun hours if not minutes before Nathan arrived.

Finally, Bey separately challenges Sprague's statement that "if she ever died, [Bey] would be the one to kill her." He believes this statement falls outside the necessity exception's purview because Sprague was not reporting something she had perceived. Instead, Sprague was opining on what would happen if she died.

12

But to satisfy the exception's second requirement, K.S.A. 60-460(d)(3) requires only that the statement be made when the matter had been recently perceived and while the declarant's recollection was clear. Nothing in K.S.A. 60-460(d)(3)'s language limits the statement's content to observed facts. Sprague's statement—that if she died, Bey would be the one to kill her—reflects her mental state after recently perceiving Bey's threats and violence—even if it does not convey factual observations. Such statements fall within the scope of the statutory exception. See *State v. Owens*, 314 Kan. 210, 228, 496 P.3d 902 (2021) (deceased's statement that defendant was "getting on [her] nerves" was admissible under K.S.A. 60-460[d][3] because it explained her state of mind after seeing text messages from the defendant); see also *Evans*, 313 Kan. at 977, 983-87 (deceased's statement that "'[i]f there's ever a time that I'm not around here anymore, the bitch shot and killed me'" admissible under K.S.A. 60-460[d][3]).

In short, the evidence supports the district court's finding that Sprague's statements were made when the matter was recently perceived and her memory of it was clear.

B. *The district court did not abuse its discretion by finding Sprague had no incentive to falsify or distort.*

Sprague's statements met the first two requirements for the necessity exception—unavailability and recent perception. We now consider the third requirement: whether the declarant made the statement "in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 60-460(d)(3).

In its pretrial ruling, the district court found the State had met this requirement, explaining,

"[T]here were no divorce, no PFAs, protection from abuse or protection from stalking actions pending. There was no criminal action pending. There was no indication that

13

[Sprague] even had available any sort of civil cause of action to bring against [Bey] other than perhaps a PFA or PFS, so she really had no—there was nothing there to encourage her to provide false statements to her friends."

The court added: "The circumstances in which [the statements] came up . . . these are circumstances where [Sprague] is simply telling her coworkers what's happening in this time in her life."

The evidence supports the district court's findings. There is no evidence that Sprague or her representatives had commenced actions against Bey before she made the statements. She repeatedly told friends, family, and coworkers that Bey was physically abusing her and had threatened to kill her. This consistent theme repeated in multiple declarations to different people in her life lends credibility to her statements. Witnesses also saw Sprague with physical injuries and in emotional distress, corroborating her claims of abuse. And when Sprague told Nathan that Bey had a gun, the circumstances suggest she was trying to protect her son, not disparage Bey. See *State v. Coones*, 301 Kan. 64, 81, 339 P.3d 375 (2014) (victim's statement that the defendant had confronted her was admissible under necessity exception because statement was made before murder trial commenced and no evidence suggested victim had reason to lie in casual conversation with daughter).

Bey admits "there is nothing in the record to indicate [Sprague] exaggerated or made up" the events she described. Even so, he argues that Sprague may have overstated Bey's mistreatment because "it is not uncommon for people to exaggerate their troubles in life to gain a sympathetic ear." But a general human tendency to embellish stories for attention or understanding is not proof of unreliability. See *Smith*, 215 Kan. at 268 ("We are not prepared to say that human nature or self-interest alone gives a participant in an event an incentive to fabrication."). If that were the case, the statutory exception would never apply.

The State showed that Sprague's statements met the necessity exception's three requirements. And the district court operated within its lawful discretion to admit these statements at trial under K.S.A. 60-460(d)(3).

II. *The district court did not err by admitting Sprague's statements about Bey's prior bad acts because they were relevant to prove disputed material facts.*

We now consider Bey's second evidentiary challenge to Sprague's statements. Her statements described several crimes, including domestic violence, criminal threat, and criminal possession of a firearm. Bey argues that some of this evidence was inadmissible under K.S.A. 60-455.

That statute generally prohibits courts from admitting evidence of a person's prior crimes or civil wrongs to prove that person's propensity to commit a crime or civil wrong on another occasion. K.S.A. 60-455(a). But such prior bad-acts evidence is admissible "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 60-455(b); see also *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006) (list of material facts in K.S.A. 60-455[b] is exemplary not exclusive).

Courts use a three-part test to decide whether prior bad-acts evidence is admissible under K.S.A. 60-455. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018). First, the court considers whether the fact to be proven is material—that is, whether the fact has "'some real bearing on the decision in the case.'" 308 Kan. at 1392. Second, it decides whether the evidence is relevant to a material disputed fact. Finally, it considers whether the evidence's probative value outweighs its prejudicial effect. 308 Kan. at 1392-93.

15

We have unlimited review over the district court's decision at the first step—whether the fact is material. And we review the district court's decision on the second and third steps for abuse of discretion. 308 Kan. at 1392.

Both in its pretrial ruling and when Bey objected to the statements at trial, the district court ruled that the evidence was admissible under K.S.A. 60-455(b). On appeal, Bey concedes that Sprague's statements about his gun ownership were relevant to prove identity for his criminal-possession-of-a-firearm charge. But he argues the district court erred by admitting Sprague's statements about Bey's domestic violence and criminal threats. He believes this evidence was not relevant to disputed material facts. We address each challenge in turn and conclude that the district court did not err.

A. *Sprague's statements about Bey's criminal threats were admissible to prove motive, intent, and premeditation.*

Sprague's statements about Bey's criminal threats to kill her were admissible to prove motive, intent, and premeditation. Intent and premeditation are both elements of Bey's first-degree premeditated murder charge. See K.S.A. 21-5402(a)(1). And while motive is not an element, "evidence of its existence can be highly persuasive circumstantial evidence of guilt." *State v. Vasquez,* 287 Kan. 40, 52, 194 P.3d 563 (2008). So, prior bad-acts evidence relevant to a defendant's motive can also be admissible under K.S.A. 60-455. *Haygood*, 308 Kan. 1387, Syl. ¶ 2.

Evidence that a defendant threatened the deceased is generally relevant to show motive and intent. *Coones*, 301 Kan. at 78-79. And threats made by the defendant before or during a killing can support an inference of premeditation. 301 Kan. at 78-79.

But Bey challenges the relevance of Sprague's statements about his criminal threats on two grounds. First, he claims the evidence could only be relevant to his intent

16

or premeditation if the threats were "directly tied, temporally" to the killing. And he suggests no evidence shows the threats were temporally tied to the murder. Second, he claims the threats were not relevant to prove motive or intent because the threats were conditional—that is, Bey threatened to kill Sprague if she did not comply with certain demands—and no evidence shows the conditions were met.

But these arguments go to the weight of the evidence, not its admissibility. See *State v. Winston*, 281 Kan. 1114, 1128, 135 P.3d 1072 (2006) ("'Matters tending to reduce or enhance the apparent probative value of evidence affect only the weight of such evidence and not its admissibility.'") (quoting 29 Am. Jur. 2d, Evidence § 309). As noted, the criminal threats Sprague discussed occurred within six months of her murder. They weren't so temporally remote as to be irrelevant. See *Vasquez*, 287 Kan. at 52-53 (domestic battery occurring about five months before murder not so remote in time as to render incident irrelevant to motive). The district court properly left it to the jury to decide what weight to give this evidence. See *State v. Corbett*, 281 Kan. 294, 310, 130 P.3d 1179 (2006) (jury is tasked with weighing evidence). The same holds true with the conditional nature of his threats. Whether the State's evidence convinced the jury that the conditions were met or the weight to be given to the evidence if the conditions were not met were decisions properly reserved for the jury.

So the district court did not abuse its discretion by admitting evidence of Bey's criminal threats under K.S.A. 60-455.

B. *Sprague's statements about Bey's domestic violence were relevant to prove motive, intent, and the nature of the relationship between the parties.*

The district court also found that Sprague's statements about Bey's domestic violence were relevant to several material disputed facts. Bey argues these statements were irrelevant to prove motive. He adds that the evidence would only be relevant to

17

prove the nature of their relationship if there was a similarity of conduct—for example, if Bey had previously threatened Sprague with a gun. We disagree.

Our precedent confirms that evidence showing Bey physically abused Sprague is relevant to prove both motive and intent. See *Gunby*, 282 Kan. at 49 (testimony about prior violent incident between defendant and deceased relevant to prove motive, intent, and lack of mistake or accident); *State v. Anicker*, 217 Kan. 314, 316, 536 P.2d 1355 (1975) (evidence of prior violence and threats against deceased properly admitted as relating to intent and motive).

The prior abuse was also relevant to prove the nature of the couple's relationship, even if Bey never threatened to shoot Sprague. The turbulent relationship provided context for the events surrounding Sprague's murder. It helped explain why Bey would kill a woman he dated. And it also helped explain why Sprague did not contact the police on December 23 after Bey threatened to kill her. See *Evans*, 313 Kan. at 989, 991 (evidence of tumultuous relationship between defendant and deceased relevant to provide context surrounding murder and explain why defendant would have behaved as charged).

C. *We decline to address Bey's argument that Sprague's statements were not relevant to prove identity.*

The district court also found the prior bad-acts evidence was relevant to prove the murderer's identity. Bey argues on appeal that neither Sprague's statements about Bey's threats nor her statements about domestic violence were relevant to prove identity. But we have already concluded that Sprague's statements were properly admitted to prove other disputed material facts, such as motive, intent, premeditation, and the nature of the parties' relationship. So we need not consider whether the evidence was also relevant to prove identity. See *State v. Garcia*, 285 Kan. 1, 18, 169 P.3d 1069 (2007) (because evidence was admissible under K.S.A. 60-455 to prove identity, any challenge to the

18

alternative basis of intent was moot); *State v. Boggs*, 287 Kan. 298, 310, 197 P.3d 441 (2008) ("[A] district court's admission of evidence under K.S.A. 60-455 may be upheld on review even if its rationale was in some way erroneous if an appellate court determines that the evidence was otherwise admissible under the statute.").

The district court properly admitted Sprague's statements about Bey's criminal threats and domestic violence under K.S.A. 60-455 because they were relevant to disputed material facts in the case. Bey fails to show that the district court's ruling is based on factual or legal error.

III. *The State did not commit prosecutorial error.*

Bey next argues the prosecutor erred in closing argument by using a puzzle analogy.

When analyzing a prosecutorial-error claim, we first decide whether the prosecutor's acts fall outside the wide latitude granted to the prosecution, constituting error. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If we find error, then we consider whether it is constitutionally harmless—that is, whether the State can show there is no reasonable possibility that the error contributed to the verdict. 305 Kan. at 109.

At the beginning of closing argument, the prosecutor likened reaching a verdict to assembling a puzzle:

> "We talked about it in jury selection. What is it that will make you a good juror? And some people said, I like puzzles, I'm inquisitive. And if you like puzzles, this one's for you. We don't have an eyewitness. We don't have somebody who can just come forward and say, I was there and I watched Ahmad Bey kill . . . Melinda Sprague. What we have, though, are circumstances, all of the circumstances that start coming together to point to the killer, that lead you to who killed Melinda on Christmas Eve 2019.

"You know, I'd like to think of a puzzle—when you go buy a puzzle and you bring it home from the store and you rip open that box, on the front, there's a picture. And it shows you exactly what's inside—or should be inside. And you see it's a beautiful landscape. And then you open it up and you pour it out and you've got all these pieces of that puzzle. That's what this is, ladies and gentlemen. That's what this evidence is. This evidence are those pieces.

"What I want to do now, for the next 30 minutes or so, is walk you through and show you when you put these pieces together that they look like guilty. They look like the front of that box that you're going to see. We have to prove certain things. We've done that by this evidence.

"When you get back in that jury room, if you want to spend some time, you can do it. You can link up all of these pieces of evidence. You can put them together, and you'll see exactly what I'm going to show you here. But what I've tried to do with this PowerPoint is walk you through each step of the way so that you can see it and you can verify for yourselves if you want to, but I think—well, I'll ask at the end of this that you'll find we've proven that picture."

Bey argues that our court has forbidden prosecutors from using this analogy. This is not entirely correct.

We have disapproved the puzzle-with-a-missing-piece analogy when prosecutors use it to explain the reasonable-doubt standard. See *Sherman*, 305 Kan. at 115-16; *State v. Crawford*, 300 Kan. 740, 755, 334 P.3d 311 (2014). Such analogies present two problems.

First, they can improperly define reasonable doubt by assigning it a certain quantity. For example, in *Crawford*, the prosecutor asked potential jurors during voir dire to imagine a lighthouse puzzle with a few pieces missing. The prosecutor argued that jurors could tell it was a lighthouse despite the missing pieces and likened this to the

20

reasonable doubt standard. *Crawford* noted that the prosecutor's analogy was a "dangerous attempt[] to quantify reasonable doubt." 300 Kan. at 755; see also *United States v. Pungitore*, 910 F.2d 1084, 1128 (3d Cir. 1990) (prosecutor's statement that State's case was like a 500-piece puzzle with 8 pieces missing improperly suggested quantitative measure of reasonable doubt but statement was not prejudicial); *Lord v. State*, 107 Nev. 28, 35, 806 P.2d 548 (1991) (prosecutor's statement suggesting that having 90-95% of pieces of puzzle sufficient to convict was error but not prejudicial).

Second, these analogies can imply that the jury may use prior knowledge to fill in gaps in the State's case—the missing puzzle pieces. In *Sherman*, we held that the prosecutor erred by illustrating the reasonable-doubt standard using a picture of Mount Rushmore with Theodore Roosevelt's face removed. 305 Kan. at 115. We explained that "[s]uch illustrations are inappropriate because they foster the illusion that the jurors already know the full picture of the case they are hearing and are simply looking for pieces of evidence to match it." 305 Kan. at 116.

But we have not disapproved of puzzle analogies when prosecutors use them to explain the role of circumstantial evidence. *State v. Lowery*, 308 Kan. 1183, 1204, 427 P.3d 865 (2018). For instance, in *Lowery*, the prosecutor likened each witness to a piece of a puzzle and explained "it's my job to put those pieces together and show you what had happened." 308 Kan. at 1200. And we found that analogy distinguishable from *Crawford* and *Sherman* because the prosecutor used it to explain the viability of circumstantial evidence and not to define reasonable doubt. 308 Kan. at 1204.

Here, the prosecutor's analogy is more like the one in *Lowery* than the ones in *Crawford* and *Sherman*. The prosecutor used the analogy to explain how a case can be built on circumstantial evidence. He did not link the analogy to the reasonable-doubt standard. Nor did he suggest the jury could rely on prior knowledge to fill in any gaps in the State's case. In fact, the prosecutor never even mentioned missing puzzle pieces.

21

Bey focuses on the prosecutor's reference to the completed picture on the front of a puzzle box. Bey believes this reference effectively told the jury it should reach a conclusion—Bey is guilty—and then assemble the evidence to fit that conclusion. But when deciding whether a prosecutor erred, we must consider the challenged comments in context rather than in isolation. *State v. Waldschmidt*, 318 Kan. 633, 649, 546 P.3d 716 (2024). And in context, the prosecutor's analogy permissibly explained how the State's circumstantial evidence could support a guilty verdict.

Certainly, the prosecutor mentioned the front of the puzzle box. But he also acknowledged that the State needed to prove certain facts with evidence—the puzzle pieces. And he said that he would walk the jury through the evidence and show how the jury was "going to see" the picture on the front of the box was a guilty verdict. This phrase—"going to see"—implies the jury did not already know what was on the front of the box. The prosecutor also encouraged the jury to "verify for [itself]" whether the evidence supported that picture. And he asked the jury to find that the State had met its burden to prove its "guilty verdict" picture. Given this context, we find the prosecutor's references to the front of the box were not error.

IV. *Cumulative error did not deprive Bey of a fair trial.*

Finally, Bey contends the cumulative effect of the alleged trial errors deprived him of a fair trial. But we have held that no trial errors occurred. So there are no errors to aggregate.

Judgment of the district court is affirmed.

LUCKERT, J., not participating.

22